Thank you, Gabe. We'll proceed to the next case on our docket, which is Latasha Mitchell v. Select Portfolio Servicing, Inc. And that case was submitted on briefs. So that case is submitted on the briefs then. The next case on the argument calendar is United States v. Ole Hougen, and it's numbered 21-10-369. And for the appellant, we have Ms. Crippet. And for the appellee, it's Sydney Foster from DOJ. All right. So we should proceed with the appellant's argument. Good morning, Your Honors. Tamara Crippet and Laura Bernard on behalf of Ole Hougen. I am prepared to discuss the public trial Miranda and evidentiary issues. My colleague, Laura Bernard, is prepared to discuss the 13th Amendment issue, and we'd like to reserve five minutes for rebuttal. That's fine. Just watch the clock. Yes, Your Honors. Try to stop then. Mr. Hougen was deprived of his right to a public trial. And we know this because General Order 73 mandated the complete closure of the federal courthouses to the public during the height of the pandemic, including when Mr. Hougen's trial was to take place. And we know from General Order 78, which we did not cite in our papers but are happy to provide as a supplement, that this order wasn't abrogated until July of 2021. And the order specifically only allows counsel, the parties, and witnesses to be present in the courtroom for trials or other persons having official court business. General Order 73 specifically states that members of the public and press can attend courtroom proceedings via the Zoom or via audio hearings. In Mr. Hougen's case, the court ordered that the trial proceed through clerk's minutes via audio proceedings. And we know now from Allen, another of this court's cases that was decided in 2022, that audio proceedings constitute a complete closure. In light of that, Mr. Hougen was deprived of that right. The government asserts that the presence of Mr. Battle's mother changes that to somehow suggest that the proceedings were open to the public. But in fact, she was there ostensibly as a witness to discuss the effect of marijuana use on her son as he was prepared to testify in the trial that morning. And the court wardered him as to whether he could still do that, notwithstanding the fact that he had smoked marijuana previously that morning. The government also suggests that Judge Dowler... The judge seemed surprised that she was in the courtroom. How did she get in? Was the doors locked? Through the courtroom security officers, Your Honor. And had she not had official business, they ostensibly would have told her she couldn't participate in light of General Order 73. Counsel, I have a question for you. Yes, Your Honor. Did your client ever object? He did not, Your Honor. So the standard of review for us is the plain error standard. Your Honor, we do think we can satisfy the plain error standard. We also suggested in our briefs that it might not be necessary to reach that framework of review. We cite a case, Mancini v. Flores, where the parties didn't have an opportunity. It wasn't raised in the courtroom. We do think, however, we can satisfy the plain error review standard should the court think that's the best vehicle here. I'm just speaking for myself, not for other judges. Yes, Your Honor. I'm interested in whether the error was plain in the sense of clear and obvious. And I'm interested in the fourth prong of that standard also as to whether, if we did not give relief to your client, it would impair the fairness, integrity, and reputation of the court. And I'm happy to address both of those, Your Honor. In terms of the plainness of the error, there was error and it was plain. And it was error because of General Order 73 closing the courthouse to the public. And it was plain because of the access via audio hearings only, which this court in Allen stated constituted a complete closure. Allen came out subsequent to the trial, but the United States Supreme Court in Henderson dictates that an error, as long as the error is plain at the time of the appellate review, it constitutes plain error. So to the extent that Allen hadn't yet been decided, that doesn't impact the calculus as to whether the error was plain at the time of this appeal. And notwithstanding Allen, certainly the other, the circuit's precedent in Waters, the United States Supreme Court case, Presley v. Georgia, certainly established the right to a public trial unequivocally. In terms of the fourth prong that Your Honor suggested he was interested in, we satisfy that standard. And in fact, it's hard to envision a case more than this one that would satisfy that standard. And that's the fourth prong speaks to fundamental fairness, the integrity and public reputation. And there are a litany of reasons that courts give in public trial cases for why the fundamental fairness, integrity and public reputation are affected. This court in Allen suggested several of those, the importance of observing witnesses, the shifty eye, the sweaty brow, how critical it is to observe people in the public, not just through audio. The confidence of the public that they're aware that they can attend these proceedings. The fairness of the defendant in knowing that the public is able to come and observe the proceedings against him. Negron-Sostra, a First Circuit case rather, speaks to similar factors and how important the public trial right is. In this case, and Becerra and Ramirez, Ramirez, other of the circuit's precedents that discuss these factors. But in this case, specifically, the public trial right is particularly important because it was the entire trial. And the United States Supreme Court in a case, United States v. Weaver, has a line at 1912 where it says when it's assessing whether in the context of an ineffective counsel claim on habeas review, whether that meets the standard, the prejudice prong of that analysis. It says in distinguishing the facts of Weaver, which involved just the closure of Wardeer. It says even so, this was not the complete closure of a trial, indicating that that was very significant to the Supreme Court, that they were denying relief in a case where it was the closure of Wardeer, but not the entire trial, which I think is a significant point. In addition to that, this was a hate crime case, which several months after George Floyd, at a moment where the public was particularly interested and continues to be particularly interested in this type of case. And on top of that, it was a case of first impression in this district. So for those reasons, we think under Weaver, under Allen, under Negron, Sostro, Becerra, Ramirez, Ramirez, not only is it that the public pardon your honor. We think for all those reasons, and this case, this circuit's precedent, this satisfies particularly the public reputation and integrity of proceedings because it was the entire trial, because it was a hate crime, because it was an issue of first impression. Counsel, am I right that there was a third circuit case that addressed the fourth prong of plein air review in a context like this? I don't know off the top, your honor, to which case the court refers. Let's see a third circuit case. Did you have a name of the case? Yes, Williams. United. Yes, your honor. United States v. Williams. I'm happy to discuss that. The court there indicated that two days of jury selection was not sufficient to satisfy the fourth prong of the plein air analysis. Our case is very distinct from Williams. Williams, first, the fact that it was only board year and it was two days of a seven week trial was significant. And I think the United States Supreme Court sort of in the same vein as the Williams case says, look, we're not dealing with the closure of an entire trial. We're dealing with just the closure of voir dire for a handful of days. So I think that already Williams and Weaver, I think, are in the same boat on that distinct from Hogan's situation. And the Williams case also talks about sort of practical factors, although it notes that that's not dispositive. But it does discuss the fact that it's a multi codependent case, that there are over 100 witnesses, that a retrial of that kind of magnitude would be, you know, a real strain on the court. We're not dealing with a seven week trial with hundreds of witnesses and the issues in Williams. You know, there's no indication that there are matters of particular interest and significance to the public at that moment in time as we were dealing with with Hogan in the context of a hate crime trial. But Williams, I think the main point that differentiates it is really the fact that the closure was two days of a seven week trial. And what we're dealing with here is the entire closure of a trial. Thank you. Welcome. And if the court doesn't have. Well, I should address briefly the issue of waiver. The government makes much of that issue in our case. I agree with Judge Gould. The extent that the court were to find automatic reversal weren't the appropriate framework. That plain error is the appropriate framework as opposed to a waiver framework. And I'll just briefly address the court sites in support of its assertion that waiver should apply. It cites a case called United States v. Levine, which is a Supreme Court case that was decided in 1960. Interestingly, it predates United States v. Olano, which is the modern plain error test. And it the language in Levine itself is reminiscent of now the language we see in the modern plain error test. It talks about whether publicity affected the proceedings and whether there was prejudice to the outcome. The cases that the government sites that reference Levine in this circuit don't suggest that forfeiting a claim is tantamount to waiver in the context of public trial. They say United States v. Rivera, which is a Ninth Circuit case that does say Rivera. And in fact, it classifies it as a forfeiture case. And they also cite United States v. Cazares, which is a case where a defense counsel is ceded to the request to waive part of voir dire being in camera. And also one defense counsel who affirmatively requested that the proceedings continue for the voir dire, that they continue to be in camera. Notwithstanding this, the defense counsel acquiescence to the closure, Cazares says that it's applying a plain error review standard, ultimately concludes that it's that the challenge has been waived as a result of defense counsel's agreement. And we don't have a situation like that here. So I did want to highlight that the court should not view this claim as waived. It's not a question of waiver, it's a question of procedural forfeiture. There are values at stake in requiring an objection. As Justice Kennedy wrote in Weaver, when a defendant objects to a courtroom closure, the trial court can either order the courtroom open or explain the reasons for keeping it closed. When a defendant first raises the closure issue with an ineffective assistance of counsel claim, I would add in brackets also undirected appeal. However, the trial court is deprived of the chance to cure the violation, either by opening the courtroom or by explaining the reasons for the closure. There is significant prejudice here to the government and to the public's perception of the fairness of the trial. And then, and Justice Kennedy goes on, this limitation on an appellate court's authority serves to induce timely raising of objection claims and objections, which gives the district court the opportunity to consider and resolve them. That comes from another Supreme Court case called Puckett. But one of the other aspects of this that Judge Kennedy didn't mention is sandbagging the district judge. That is, a defense lawyer can know about the violation and not say anything in the hope that he might get an acquittal. And if he gets a conviction, then he can raise it on appeal. And there are fundamental reasons and values that suggest that these considerations of policy should be taken into account in exercising what the Supreme Court has called our discretion to invoke the plain error rule. Yes, Your Honor. We don't even know here. We don't even know if this courtroom was locked. Your Honor, we do. Why didn't counsel object? Your Honor, certainly counsel should have objected. And I will note, I think the passage that the court that Your Honor just read from Weaver actually supports in some way Mr. Hogan's position. Now, it is true that counsel should have objected. It's also true that the court has an independent obligation, and this court in Allen described it as a sua sponte obligation to make sure that his courtroom is open to the public. And those sentiments were echoed in Negron Sostra, too, where in Puerto Rico, the courts were routinely closing the courtroom for voir dire for practical reasons. So I think a combination, certainly the defense should have raised it with the district court at the time. That should have been done. And that it might have cured the error instead of ordering a retrial three years after the fact that in case involving a racially motivated crime. At the same time, Your Honor, one point that the Supreme Court does make in Weaver is and Weaver already in the ineffective assistance of counsel context, several layers down the appellate review chain. And it says the time to address these problems is on direct review. Certainly it would have been ideal had it been objected to at the time. It would have been ideal had the court raised it on his own accord, as would have been consistent with Presley v. Georgia. And this quote dictates in Allen that wasn't done. And the time to address it is on direct review where things are still relatively fresh, as opposed to, as the Weaver court notes, several years down the line when they were getting this on habeas review. And I think, you know, the factors that notwithstanding the inconvenience and the practicalities that militate towards a retrial, even in light of what the court has just has just noted as as a significant practical impact on the court are the fact that the entire trial was closed. And the fact that it was a trial of such tremendous public significance and the fact that the court, you know, we were kind of in an interesting moment in time, but notwithstanding the general orders were that the courthouse was closed to the public and to the press. And the court could have, instead of issuing audio minutes, could have issued Zoom. That wouldn't have been that wouldn't have been very inconvenient or would have, you know, and it would have remedied the problem. He might have, if there had been an objection or a suggestion that this be available on Zoom, if that's your problem. I mean, this is a serious problem. These are serious. These are serious considerations that ought to be taken into account. You're dealing with a very general standard about the public's fairness and integrity, etc. But the reality is, is that there are there are other considerations that also go to that. If you're suggesting that it should have been by by Zoom instead of audio, he could have asked for it and you wouldn't have been here today. Your Honor, in every case where a claim wasn't objected to, it's it's not ideal. That's, you know, that's beyond dispute. It would have been ideal had it been raised at the time. It wasn't. And now the issue is whether it's appropriate to have a retrial. And we think that's necessary because of the fundamental fairness, integrity and public reputation of the proceedings. Those are just words. I could I would suggest that they apply equally to setting aside this conviction three years after the crime was committed, where there may be problems with with with witnesses. Who knows that that might undermine the public's perception of the fairness and integrity of the trial? I would say, Your Honor, this court's precedents support a finding of the public integrity, the public reputation and the integrity and a reversal on those grounds. The considerations that the court raised in the Sarah and then again were supported in Ramirez Ramirez. The Weaver, the United States Supreme Court in Weaver, noting it would have been different had it been potentially different had it been the complete closure of a trial. All of those factors, I think, surpass the practical considerations of having to have a retrial considerations that you mentioned in terms of the public's perception and other things. They're just they're just a precondition to our ability to exercise the discretion of whether or not to reverse. They are, Your Honor, but if you read it, if you read those words in the Supreme Court case in context, there is discretion to invoke the plain error rule where all of those other factors are present. So we could find all of those other factors are present and still have some discretion as to whether we should grant relief here. Certainly, Your Honor, however, I don't think the precedent of this court supports not granting relief because of the practical considerations Your Honor has outlined. Counselor, you're over your time. Yes, Your Honor. And you probably would like to do a little rebuttal of the government's argument. Yes, Your Honor. So I was going to suggest that perhaps you could conclude your argument in another sentence and then we'll let the government argue. And then I'll give you, although your time's up, I'll give you an extra two minutes to make rebuttal. And also, if Ms. Foster for the government needs an extra two minutes, she can have it as well. But we sort of have to get past the opening argument. Yes, Your Honor. Thank you. In summary, the defense position is that the fourth prong of the plain error analysis is met under Becerra under Ramirez. Ramirez-Williams doesn't alter that conclusion. This was a relatively short trial. It did not involve hundreds of witnesses. It was not just the two-day closure of Wardere. It was in a seven-week proceeding. It was a one-week affair. And on that note, I will let the government turn to the government argument. Okay, thank you. So we'll proceed to Ms. Foster. Thank you. May it please the court, Sidney Foster for the United States. There are, of course, three independent grounds on which this court can resolve the public trial issue. It could rule that Hogan's claim is waived, or it could simply assume that the claim was not waived. In which case, as Your Honors just were discussing, that would mean the plain error review applies. And the court could then reject the claim on either prong two of plain error review or prong four of plain error review. And I'd like to start with the two plain error grounds because I think they are probably the simplest and most straightforward ways for this court to resolve the issue. It seems clear and the council has conceded that Hogan should have objected in district court to the alleged courtroom closure. So the only question on the plain error issue is whether or not prongs two and four were satisfied. And it is, of course, Hogan's burden to satisfy both prongs. I'd like to start with prong two. The question, of course, in prong two is whether or not there was a clear or obvious public trial violation in this particular case. And the record on this question is simply unclear. And it follows, therefore, under decisions of this court that Hogan cannot satisfy his burden on prong two. So let me walk through why the record is unclear on this question. And I think the first major piece of information that we have about whether or not there was a courtroom closure is general order 73. And let me just set the stage for just a moment before I get to general order 73. Everyone, I think, acknowledges that the only electronic access to the trial was by telephone. And so then the question of whether there was a courtroom closure turns on whether or not members of the public were allowed to attend the trial in person. That's our question that we need to know the answer to, to know whether there was a plain error. Now, general's order 73 does speak to this issue. But as we explained in our brief, it actually gave individual district court judges discretion as to whether to allow individual members of the public into the courthouse for particular proceedings. We know that because the general order describes who is authorized to come into the courthouse. And it includes in that group individuals who are required or permitted by a presiding judge to attend a specific in court proceeding. So under that language, the district judge here could have, if he wished, allowed members of the public to attend in person. Now, that order does also say that members of the public may observe proceedings by telephone or by video conference. But it doesn't say that those are the only means that are available to members of the public. And so that order did give individual district judges discretion as to whether to allow members of the public to attend in person. And I think this court's decision in Allen essentially recognized as much when it was describing the general orders that applied there, which are the same as the general orders that apply here. It cited the relevant language in another general order 72-6. And then it cited some language on the court's website that was essentially summarizing the language I just quoted from general order 73 about individual district courts having discretion. And then Allen went on to explain that the district judge there went beyond the general orders in precluding members of the public from attending in person and instead allowing them to have access to the trial there only by telephone. So I think there's no question that there was discretion for the district court to allow members of the public to attend in person. The only real question here is what happened in this particular case. And again, on that question, we too don't have a clear answer. And so that's why this claim fails under prong two. There's two kind of relevant pieces of information bearing on that question. One is that we do have the clerk's notices that Hogan highlights that did provide for the call-in number and the passcode and so forth. And it did say that the call-in number would allow for a public hearing by telephone. But those notices are ambiguous as to whether or not that was the only way that the public could access the hearing. They may well have just reflected the reality that was present at that time. Keep in mind the trial here was early April 2021. That's before the vaccines were rolled out to the general public. And so that language may well have just reflected the practical reality that there may be people who were interested in coming to the trial, but who did not want to come in person because of the risks posed by COVID. And in order to give those individuals access to the trial, there needed to be an electronic means provided. The clerk's notices never say that the telephonic access that was being provided was the only way for the public to access the trial. A second piece of information that we have that bears on this question is the fact that we know on the third day of the trial that the victim's mother was in the courtroom. It's pretty rare actually that we have transcripts that tell us that someone from the public was in the courtroom, but this is one of those rare instances where we do have that. The court, it happens to be reflected in the transcript. And she is, of course, a quintessential member of the public, and that suggests that members of the public were allowed to come to the courtroom. Now, I know Hogan claims that she was there to be a witness. I think if you look at the relevant pages of the transcript, you'll see no indication that the court or counsel thought that she was going to be a witness. The only possible indication that she might have been a witness was the fact that when SB was testifying with the judge, he was talking about his ability to testify later that day. He made a reference to the fact that the judge, if he wished, could ask his mother a particular question. The mere fact that SB made a reference to the fact that the judge could ask his mother a question certainly doesn't mean that the court or counsel thought she was there to testify or that the court had admitted her for that very purpose. And I think it bears emphasizing here that the record is unclear because Hogan failed to raise his objection in district court. Had he done so, the court could have developed a record on this question and potentially avoided a violation. Just kind of implicating the values, I think, Judge Corman, that you were discussing earlier. So under the stringent plain air standard, which is, of course, designed in part to encourage timely objections and to prompt the development of an adequate record, Hogan's claim fails at prong two. Now, that's a sufficient basis for this court to resolve the public trial claim. But prong four also offers this court an independent basis for resolving the public trial claim. And I'd like to just address that briefly as well. So, of course, Hogan has the burden under prong four to establish a serious effect on the fairness, integrity or public reputation of the proceedings here. And he cannot make that showing for a number of reasons. So, first of all, there were several structural features of this trial that ensured that any error would not have a significant effect on the interests that are protected by the Sixth Amendment. And that is, of course, to use the words of Waller, ensuring that participants are keenly alive to a sense of their responsibility and the importance of their function. And so those structural features are the fact that the audio here at a very minimum, the audio here was available to anyone anywhere in the world who wanted to call in using the call in number. A full transcript of the proceedings was made available and there was media attention both before the trial and immediately after. And I want to focus on the audio and transcript kind of features that I just highlighted and why they're so important. The availability of audio and the availability of the transcripts certainly do not negate any Sixth Amendment violation if there was one here. But they did substantially reduce the degree of harm that would flow from any public trial error because they captured the most important parts of this particular trial. They captured the substance of the proceeding, the facts to which the witnesses testified and the arguments that the attorneys made to the jury. And they also captured voice inflections and emphases, which are also important. They therefore together, they ensure that the participants in the proceeding were aware that they were subject to public scrutiny. And that, of course, is the very purpose of the public trial, right? This is, of course, been quite different from other types of public trial violations. This court often sees where an entire proceeding is completely closed to the public and the public cannot contemporaneously access any substantive, much less oral information about what happened. And maybe foreclosed from accessing that information later as well. In addition to those structural features, another relevant consideration at prong four is the fact that there's no indication in the record here that any of the harms against which the public trial right protects actually came to pass. So there was no suggestion here of misbehavior on the part of the judge, on the part of prosecutors or other participants. There's also no suggestion that the case participants didn't approach their duties with the integrity and serious purpose that our system demands. And I'm here using the language of Weber, which he analyzed similar questions in the ineffectiveness of a council context. And of course, it's important to bear in mind Supreme Court's repeated admonitions that Judge Corman you referenced. The reversal under the plein air standard should be very difficult to obtain, thereby encouraging timely objections and reducing wasteful reversals, which would include a reversal here for a week long trial concerning a crime that took place about three years ago. So for all these reasons, Hogan has not established that he has met the standard under the fourth prong. This court should not exercise its discretion to reverse. And we do think that the Third Circuit's decision in Williams supports that conclusion. Could you elaborate on the Third Circuit's reasoning in Williams? Yeah, sure. The Third Circuit, I mean, considered a variety of factors. Among others, it considered the very factors that I was just examining, looking at sort of whether there were any of the harms kind of protected by the public trial right came to pass. Was there any misbehavior in the record? So for that kind of thing, it also evaluated it. I mean, the degree of the violation, some aspects of the decision for sure were different from this case. There was a closure of the voir dire proceedings, which is different from a whole trial. It considered also the costs of a reversal and that the cost would be quite high in that case for an entirely new trial. So it was a very case specific and fact intensive inquiry as is required, of course, under prong four. But it certainly did rely on uncertain. But some of the factors that I mentioned, it also relied, for example, on the fact that I believe it relied on the fact that transcripts were available and that there was some publicity and the like. Thank you, counsel. I'm happy to discuss our waiver argument as well, which we think is very strong. I don't know that that's needed, but I'm certainly happy to discuss it briefly. If it's an alternative basis for ruling, I think it would be helpful to the court if you discussed it. Yeah, I'd be very, very happy to. So so, yes, as I said, this would be a third possible basis for resolving the Sixth Amendment issue. And so we the waiver argument relies on the Supreme Court's decision in Levine and then Court of Appeals decisions interpreting Levine. So Levine, of course, was in the due process context. But everyone agrees that its analysis applies equally to the Sixth Amendment context. And Levine quite squarely held that a failure to object, at least in the circumstances of unknown courtroom closure, is sufficient to effectuate a waiver of the public trial claim. To use Levine's language and to quote it specifically, Levine said that the exclusion of the public is not to be deemed contrary to the requirements of the due process clause without a request to open the courtroom having been made. That is directly controlling here. And this court has applied Levine. It's discussed Levine and Rivera. It's applied it in Cazares. And I want to discuss Cazares in just a little bit of detail, because I think there may be some confusion about kind of the reasoning in that decision. Cazares analyzed two claims at the same time in the same part of the opinion. It analyzed a public trial claim and a related claim by the defendants there that they had a right to be present at the proceedings in question from which they contend both they were excluded and the public was excluded. Now, Levine, sorry, Cazares made very clear when it discussed the public trial right that under Levine, a failure to object to a courtroom closure effectuates a waiver. It cited it for that very proposition. Then if you get to the end of the analysis in Cazares, when it makes its conclusion and reaches the conclusion that the defendants there did fail to or did waive their public trial claim, it did not cite any express waiver on the part of the defendants of the right to a public trial. It rather seemed to rely merely on the fact that they hadn't objected. That same paragraph does also find that the defendants there had waived their right to be present. And in order to reach that conclusion, the court of appeals did cite express waivers of the right to be present. But the court took a very different approach when it analyzed the waiver of the public trial right and didn't cite any express waivers seemingly than just directly applying Levine. And of course, the Fifth Circuit is the only other circuit that has directly, squarely addressed this question of whether the failure to object, at least in the case of a known courtroom closure, can effectuate a waiver. And it is squarely held that it does. That's in decision both Reagan and in Hitt. And of course, the 11th Circuit's decision in Moon, I would just note, it didn't reach this question, but it did cite the Fifth Circuit and the Ninth Circuit as being in agreement on this very point. I think prior to our decision in Dupout, we use the terms waiver and forfeiture pretty much interchangeably. And we said, no, a waiver has to be knowing the intelligence. There has to be something expressed. Forfeiture is just a failure to. So is there any reason why we wouldn't use that terminology now, given that we're bound by our decision in Dupout? Yeah, so I think there are two ways of thinking about how the Levine doctrine and Cesaris and other decisions in that line are consistent with this other doctrine that you're referencing, where the court has been very clear that waivers are an intentional relinquishment of a known right. The two ways I think that one could think about it is, number one, one could think of Levine and its progeny as exceptions to that rule. We know that there are exceptions in other contexts. This may well be best conceived of as an exception. For example, if a defendant doesn't raise a claim that's subject to a federal rule of criminal procedure 12 before trial, then that claim is the failure to object has effectuated a waiver, unless, of course, there's good cause. So there are circumstances where the failure to object is considered to be a waiver in the sense that it just extinguishes a claim. So that's one way of thinking about it. And then in that way, then Levine and its progeny are simply just an exception to that general rule. Another way of thinking about it, though, is actually related to the language from Levine that I just quoted, which is to think of a failure to object as actually resulting in there not being any public trial violation. Levine actually didn't use the word waiver. Other courts interpreting Levine have used the word waiver as kind of capturing what's going on in Levine. But what Levine did say was that the exclusion of the public was not to be deemed contrary to the requirements of the due process clause without a request having been made. So one other way of reconciling this court's doctrine about the distinctions between waiver and forfeiture and this other line of cases, Levine and its progeny, is to consider the failure to object to at least a known courtroom closure to simply mean that when you have that, that there just has been no public trial violation at all. So you don't have any kind of error. Either way, both of those ways are available for kind of reconciling those two lines of precedent. I think the thing that we know for sure is that Levine is the governing law here. And of course, this court's decisions interpreting Levine. And I'd also just mentioned that this court has an older decision, Geist, which applied a similar principle. It was pre-Levine decision, but a very similar principle. The other point I would guess I would just make, and I'm not gonna go on about it, is just that this waiver rule that we think is reflected in Levine is a rule that makes a great deal of practical sense for all the reasons that Judge Corman already mentioned. So I'm not gonna go into them in great detail, but I will note that a tardy public trial claim is particularly likely to reflect kind of that classic sandbagging that Judge Corman was mentioning. And that's in part because many defendants actually don't want a public trial. So if you don't have a waiver rule, such defendants do have every incentive to not object in district court and hold this in their back pocket in the hope that they can then advance it later as a ground for reversal. If the court has no further questions, we would ask that it affirm. Thank you, counsel. If Judge Corman or Judge Ikuda have further questions, they could pose them. I have none. Hearing none, I think we'll take it that Ms. Foster gets to retire for the day. Excellent. Thanks very much. Thank you for your argument. I'm as crepit. Could you give us two minutes of rebuttal time? Yes, Your Honor. Thank you. I'll start with waivers since it was the recent one mentioned. This court in Becerra and in Ramirez-Ramirez, both cases where the defense did not object in Ramirez-Ramirez, it was factual findings not being read in public. In Becerra, it was the reading of jury instructions not being read aloud. In both those cases, the defense did not object and the court found forfeiture rather than waiver. And that's because there was no relinquishment or no evidence of relinquishment of a known right on the record. And Depew, to Judge Ikuda's point, also suggests that you have to have the relinquishment of a known right. And in that case, defense counsel didn't object to a PSR that incorrectly calculated the offense level and that was still considered forfeiture rather than waiver. In terms of the facts with respect to Problem 2, General Order 73 is crystal clear. Members of the press and public may observe proceedings by telephone or video conference. And that follows the line dictating who may be present in the courtroom. And Order 73 abrogates the restrictions on the courthouse. So the courthouse was closed. The presence of the mother, Battle, refers to her and says, My mom can tell you about how I'm able to function under the influence of marijuana. Her role there was ostensibly to possibly testify and tell the court as to how he functioned. With regard to the sandbagging, there's simply no evidence of that on this record. Not one fact that supports that. And in terms of the fourth prong, I just like to note that the press before and after support the defense position. There is no press during the trial that either party has identified. That's a significant consideration. We don't know how the press might have changed the outcome of this case had the courtroom been open. And on that note, I see my time is dwindling and I will submit. Thank you, counsel. Well, I want to say counsel on both sides of the case have given us excellent arguments and very polished advocacy. And with so many cases coming to our circuit, the court's judges really need that kind of help from advocates. So we appreciate it. At this point, this case shall be submitted and the parties will hear from us in due course. Thank you. Thank you. That concludes our arguments for today. This court for this session stands adjourned.
judges: GOULD, IKUTA, Korman